# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIM. NO.  03-cr-234 (JDB)** |
| | : | |
| **JAMES EDWARDS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its opposition to the defendant's third *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). As in his first and second motions for compassionate release (Dkts. 79 and 94), the defendant cites the conditions at his BOP facility and several asserted medical conditions—obesity, prior lung damage, and ongoing vision problems—as extraordinary and compelling reasons for relief. *See* Defendant's Motion, Dkt. 102, 5-7.[1] The Court denied the defendant's first two motions, finding that he had not established extraordinary and compelling reasons and that the 18 U.S.C. § 3553(a) factors did not weigh in favor of his release. *See United States v. Edwards*, 2021 WL 3128870 (D.D.C. Jul. 22, 2021) (JDB); *United States v. Edwards*, 2020 WL 5518322 (D.D.C. Sept. 12, 2020) (JDB). Because defendant's present motion is not materially different from his prior ones, nor have the relevant facts changed in any material way, the Court should summarily deny this motion as well.

---

[1]  "Dkt." refers to docket entries in the instant case. "Tr." Refers to the trial transcripts. "Ex." refers to exhibits filed with this motion.

As the Court previously found, the defendant's medical conditions do not constitute extraordinary and compelling reasons for early release based on increased risk of severe illness or death from COVID-19 because he is fully vaccinated against COVID-19. *See Edwards*, 2021 WL 3128870, at *3. He received the first dose of the Moderna COVID-19 vaccine on January 14, 2021, and the second dose on February 8, 2021. *See* Ex. 4 to Gov't's Second Opp'n to Def.'s Mot. for Compassionate Release, Dkt. 93. He also recently received a booster dose of the same vaccine on January 26, 2022. *See* Ex. A, BOP Medical Records, at 85. Additionally, the defendant's arguments about his rehabilitation, vocational training, and release plan do not warrant his release under the factors set forth in 18 U.S.C. § 3553(a). Accordingly, the Court should summarily deny the defendant's request for compassionate release.

## A.  Facts and Procedural History

On May 8, 2003, police officers drove to a parking lot on Pomeroy Road in Washington, D.C. to investigate neighborhood complaints about drug activity there. *United States v. Edwards*, 424 F.3d 1106, 1107 (D.C. Cir. 2005). The defendant and a friend were sitting in a parked car in the lot. *Id.* As the police entered the lot, the defendant attempted to drive away at a high rate of speed and nearly hit a police car. *Id.* The police then approached the defendant's car, saw an open container of alcohol in it, and ordered him to stop. *Id.* The defendant instead backed his car and reached under his seat. *Id.* The officer once again ordered him to stop. *Id.* As the officer approached the car, he saw the defendant pushing two guns under his seat. *Id.* The police arrested the defendant and recovered the guns and three vials of PCP from his person. *Id.*

On June 3, 2003, the defendant was charged in a three-count indictment with: (1) unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g); (2) unlawful

possession with the intent to distribute phencyclidine (PCP), a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and (3) unlawful possession of a firearm during a drug-trafficking offense, in violation of 18 U.S.C. § 924(c). *See* Indictment, Dkt. 6. On January 22, 2004, the jury returned a partial verdict, finding the defendant guilty of unlawful possession with the intent to distribute PCP, and not guilty of possessing a firearm during a drug-trafficking offense. *See Edwards*, 424 F.3d at 1107; Verdict Form, Dkt. 33. The Court declared a mistrial on the unlawful-possession-of-a-firearm charge. *Edwards*, 424 F.3d at 1107. On April 13, 2004, the Court sentenced the defendant to 79 months of imprisonment to be followed by three years of supervised release. *Id.*; 4/13/04 Minute Entry.

The defendant appealed his conviction and sentence. After his sentencing hearing, the Supreme Court of the United States issued its decision in *United States v. Booker*, 543 U.S. 220 (2005) (Federal Sentencing Guidelines are advisory only). On September 30, 2005, the United States Court of Appeals for the District of Columbia Circuit affirmed the defendant's conviction but remanded the case to this Court "for the limited purpose of allowing it to determine whether it would have imposed a different sentence, materially more favorable to the defendant, had it been fully aware of the post-*Booker* sentencing regime." *Edwards*, 424 F.3d at 1108 (quoting *United States v. Coles*, 403 F.3d 764, 771 (D.C. Cir. 2005) (per curiam)). On April 7, 2006, this Court issued a Memorandum Opinion finding that it would not have imposed a different sentence under *Booker*, noting that "[a]lthough defendant's drug addiction contributed to his involvement in the offense, other aggravating circumstances—in particular, *defendant's lengthy criminal history, his history of noncompliance with parole conditions, his escape from a halfway house, his extensive drug use, and the seriousness of the offense*—weigh heavily against a sentence below the advisory Guidelines range[.]" *United States v. Edwards*, 427 F. Supp. 2d 17, 28 (D.D.C. 2006) (JDB), *aff'd.*

3

*by United States v. Edwards*, 198 Fed Appx. 4, 2006 WL 2828867 (D.C. Cir. 2006) (emphasis added).

On or about June 24, 2009, the defendant completed his sentence in this case and began his period of supervised release. *See* Ex. 1 to Gov't's First Opp'n to Def.'s Mot. for Compassionate Release, Dkt. 82. Within several months, the defendant violated his supervised release by using PCP and marijuana. *Edwards*, 2020 WL 5518322, at \*1. On April 28, 2010, the defendant was arrested and charged in D.C. Superior Court with committing armed robbery and armed burglary in case number 2010 CF3 007524. *Id.*; Report and Recommendation, Oct. 26, 2010, Dkt. 74. On August 24, 2010, the defendant pleaded guilty in that case to armed robbery, burglary while armed, and assault while armed. *Id.* On November 15, 2010, D.C. Superior Court Judge Ann O'Regan Keary sentenced the defendant to an aggregate sentence of 14 years' incarceration. *See* Gov't's First Opp'n to Def.'s Mot. for Compassionate Release, Dkt. 82, 4. On March 21, 2011, this Court revoked the defendant's supervised release and imposed a sentence of 26 months' incarceration, to be served consecutively to the 14-year sentence imposed by the Superior Court.[2] *Edwards*, 2020 WL 5518322, at \*1; Judgment, Mar. 21, 2011, Dkt. 77, 1.

On August 20, 2020, the defendant filed a *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Dkt. 79), which the government opposed on September 7, 2020 (Dkt. 82), and the Court denied on September 12, 2020. *Edwards*, 2020 WL 5518322 (D.D.C. 2020) (JDB). In his motion, the defendant sought his immediate release on the grounds that COVID-19 presented an impending threat within FCI Berlin, the prison facility where he was housed, and that he suffered from lung complications, which made him vulnerable to becoming seriously ill from

---

[2]  The defendant is serving an aggregated sentence for this case and his D.C. Superior Court case. *See* Ex. B, Sentence Monitoring Computation Data. The BOP has indicated to the government that the defendant is currently serving his revocation sentence for this case.

4

COVID-19. Dkt. 79. The Court found that the defendant had not carried his burden to demonstrate that his confinement at FCI Berlin or his lung injuries constituted an extraordinary and compelling reason for early release. *Edwards*, 2020 WL 5518322, at *3. The Court also determined that the defendant's lengthy criminal history and prison disciplinary record "weigh[ed] against a reduced sentence." *Id.* at *4.

On June 22, 2021, the defendant filed a second *pro se* motion for compassionate release, citing his lung injury, vision loss, and obesity, as well as the COVID-19 pandemic and the rising rate of infections at FCI Berlin. Dkt. 94, at 2, 4-5. The government opposed the motion, noting that the defendant had received both doses of the Moderna COVID-19 vaccine and that the 18 U.S.C. § 3553(a) factors militated against release because, in the time period since the Court had denied his first compassionate-release motion, defendant had received a disciplinary infraction for possessing a dangerous weapon. Dkt. 93, 1-2. On July 22, 2021, the Court denied the motion because the defendant was fully vaccinated and had received adequate care for his health conditions in prison. *Edwards*, 2021 WL 3128870, at *3-4. The Court further determined that the defendant "has not given the Court any reason to revisit its prior § 3553(a) analysis and the Court sees none." *Id.* at 4.

The defendant is currently serving his sentence at FCI Beckley in Beaver, West Virginia. *See* BOP, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed Mar. 14, 2022).[3] He is projected for release on December 4, 2024, and he is eligible for home detention on June 4, 2024. *See* Ex. B, Sentence Monitoring Computation Data, at 1. As of February 15, 2022, he had served 11 years, 9 months, and 19 days of his aggregated sentence from this Court and the D.C. Superior

---

[3]   Information about the current number of COVID-19 cases at FCI Beckley is available at https://www.bop.gov/coronavirus/.

Court, representing approximately 73.0% of his full term and approximately 80.8% of his statutory term. *Id.*

On February 11, 2022, the defendant filed the instant third *pro se* motion for compassionate release. Dkt. 122. As in his earlier motions, the defendant once again claims that his medical conditions, including previous lung complications, vision problems, and obesity, as well as the conditions of his confinement at FCI Beckley, make him vulnerable to becoming seriously ill from COVID-19. *See id.*, 1-2, 5-7. He now also argues that the 18 U.S.C. § 3553(a) factors support release because he has received vocational training in prison and plans to reenter the community by working at a restaurant. *Id.* 2-4. For the reasons that follow, the government opposes the defendant's motion.

**B.  <u>The Federal Bureau of Prisons' Response to the Pandemic</u>**

As the Court is aware, from the outset of the pandemic, the Federal Bureau of Prisons (BOP) has made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and Prevention (CDC) and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant.  But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

Under current practices, BOP institutions operate at one of three operational levels (Level 1, Level 2, Level 3). The institutions determine their operational level "based on the facilities' COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective community transmission rates." *See*

https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.   Medical   isolation,

contact tracing and PPE appropriate for each setting are in effect for all three levels. Under Level

1 operations, fewer modifications are necessary; under Level 3 operations, the BOP's COVID-19

pandemic plan is followed.[4] Many other modifications are in place, regardless of the operation

level. For example, "inmates are tested for SARS-CoV-2 when they are symptomatic,

asymptomatic but exposed, during movements, and when surveillance is needed." *Id.* Inmates who

are not fully vaccinated must complete a 14-day quarantine as new intakes or if they have a known

or suspected exposure to COVID-19. Staff and inmates who are not fully vaccinated should be

screened at least weekly when community transmission is substantial or high, and face coverings

are to be worn at all times indoors, regardless of vaccination status. *Id*.

BOP's efforts have been fruitful. Nonetheless, some inmates inevitably will be infected and

some of that cohort may succumb, just as in the population at large. However, the rate of inmate

deaths in federal prisons as a whole has been far lower than that in the general U.S. population, a

notable achievement given the risk of viral spread in a congregate prison setting.

In addition, acting under the authority granted in the Coronavirus Aid, Relief, and

Economic Security (CARES) Act, Pub. L. 116-136, 134 Stat. 281 (2020), BOP has transferred

many thousands of inmates to home confinement, focusing on nonviolent offenders who have

served the majority of their sentences. This initiative, combined with the reduced number of new

arrivals during the pandemic and the ordinary release of prisoners upon completion of their

sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased

opportunities for social distancing and reduced the strain on BOP resources. The total BOP

---

[4] The Court can find the overall number of BOP facilities at a particular operational level, as well as the operational level for a particular BOP institution, here: https://www.bop.gov/coronavirus/index.jsp.

population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.[5]

There is no way to stop the spread of this virus short of widespread vaccination. Thus, BOP has committed to making the vaccine available to all staff and inmates who choose to receive it as quickly as possible. BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation. By early February 2021, vaccine doses had been delivered to every BOP institution. BOP offered the vaccine first to full-time staff because staff members— who come and go between the facility and the community—present a more likely vector for COVID-19 transmission into an institution. On September 9, 2021, President Biden issued Executive Orders 14042 and 14043, which require vaccinations of federal contractors and civil-service employees, respectively. *See* Exec. Order No. 14043, 86 Fed. Reg. 50,989 (Sept. 14, 2021); Exec. Order No. 14042, 86 Fed. Reg. 50,985 (Sept. 14, 2021). Hence, based on these Executive Orders, BOP required that staff be vaccinated, unless they fit within an approved exception. As of December 8, 2021, the federal government had "achieved 97.2% compliance with 92.5% of employees having received at least one COVID-19 vaccination dose." *See* https://www.whitehouse.gov/omb/briefing-room/2021/12/09/update-on-implementation-of-covid-%E2%81%A019-vaccination-requirement-for-federal-employees/.[6]

When vaccines became available, BOP has offered them to inmates based on their need in accordance with CDC guidelines. In general, the vaccine is offered first to inmates over 75 years

---

[5]  Currently, the BOP has over 5,700 inmates on home confinement. The total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is over 39,000. *See* BOP, *COVID-19 Home Confinement Information*, at https://www.bop.gov/coronavirus/ (last accessed Mar. 14, 2022).

[6]  Injunctions currently are in place regarding both Executive Orders and litigation in these matters is ongoing.

of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. BOP continues to follow this practice and offers vaccination to all incoming inmates. In addition, inmates who initially refused vaccination may nonetheless receive vaccination if they change their minds. To date, BOP has administered approximately 306,000 doses to staff and inmates nationwide. *See* BOP, *COVID-19: Coronavirus*, https://www.bop.gov/coronavirus/ (last visited Mar. 13, 2022).[7]

### C.  The Efficacy of Vaccines

The vaccines approved for use by the Food and Drug Administration (FDA) are effective in significantly reducing the rate of infection and dramatically reducing the risk of severe outcomes. In its Emergency Use Authorization memoranda, the FDA stated that the Pfizer-BioNTech vaccine was 95% effective in preventing COVID-19, including in study participants with medical comorbidities associated with high risk of severe COVID-19; the Moderna vaccine was approximately 95% effective in preventing COVID-19, including in study participants with medical comorbidities associated with high risk of severe COVID-19. The FDA gave final approval to the Pfizer vaccine in August 2021 and to the Moderna Vaccine in January 2022. *See* FDA News Release, "FDA Approves First COVID-19 Vaccine," https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (Aug. 23, 2021); https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-key-action-approving-second-covid-19-vaccine (Feb. 1, 2022).

---

[7]  Information on BOP's COVID-19 vaccination efforts, including a listing by facility that is updated daily, is found here: https://www.bop.gov/coronavirus/. The clinical guidance provided to BOP health service professionals is found here: https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf.

Both the Pfizer and Moderna vaccines are effective in preventing COVID-19 among people of diverse age, sex, race, and ethnicity categories and among people with underlying medical conditions. *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html; *see also* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html. In addition, "[c]ase and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people." *See* https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. The CDC also reports that "[i]n addition to data from clinical trials, evidence from real-world vaccine effectiveness studies show that COVID-19 vaccines help protect against COVID-19 infections, with or without symptoms (asymptomatic infections). Vaccine effectiveness against hospitalizations has remained relatively high over time, although it tends to be slightly lower for older adults and for people with weakened immune systems." *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (last accessed Mar. 14, 2022).

No vaccine is 100% effective. Significantly, however, the available COVID-19 vaccines are thus far proving remarkably effective not only in limiting infection, but also in fulfilling their most important purpose: <u>limiting severe disease and death</u>. According to the CDC, "even when people who are fully vaccinated develop symptoms of COVID-19, they tend to be less severe than in people who are unvaccinated." CDC, *COVID-19 Vaccines Work* (Dec. 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html. In December 2021, unvaccinated persons were 2.2 times more likely to test positive for COVID-19 than vaccinated persons, and 14 times more likely to die from it. *See* CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-

status (last accessed Mar. 13, 2022). In January 2022, unvaccinated persons were 2.3 times more likely to test positive for COVID-19 than vaccinated persons. *Id*.[8] In addition, in December 2021, unvaccinated persons were 3.2 times more likely to test positive for COVID-19, and 41 times more likely to die from it than fully vaccinated persons, like the defendant, who have received additional or booster doses. *See* CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Mar. 13, 2022).[9] Simply put, the vaccines remain "remarkably effective at preventing serious illness. If you're vaccinated, your chances of getting severely sick are extremely low." David Leonhardt, Two Covid Americas, N.Y. Times (Jan. 25, 2022), https://www.nytimes.com/2022/01/25/briefing/covid-behavior-vaccinated-unvaccinated.html.

Importantly, the vaccines also have proven effective to date against variants. On this point, the CDC reports:

---

[8] To date, the CDC has not finished updating this webpage with information for January 2022.

[9] Similarly, A study published on January 21, 2022, indicates that the rate of COVID-19 cases among fully vaccinated persons with a booster dose was 25 per 100,000 people during October–November 2021. Amelia G. Johnson et al., COVID-19 Incidence and Death Rates Among Unvaccinated and Fully Vaccinated Adults with and Without Booster Doses During Periods of Delta and Omicron Variant Emergence – 25 Jurisdictions, April 4–December 25, 2021, CDC (Jan. 28, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e2.htm. This is substantially lower than among the nonvaccinated, for whom the rate of COVID-19 cases was 347.8 per 100,000 people. *Id*. The rate of death differs by orders of magnitude. Among the fully vaccinated with a booster, it was only 0.1 per 100,000 people, whereas among the unvaccinated, it was 7.8 per 100,000 people. *Id*.

New variants of the virus that causes COVID-19 are spreading in the United States and in other parts of the world. COVID-19 vaccines are effective against the Delta variant and other variants with widespread circulation in the United States. Current vaccines are expected to protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant.

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html.

Further, although initial studies suggest that the Omicron variant is more transmissible than previous variants, these studies also indicate that it carries a significantly lower risk of severe illness or death. *See* Press Briefing by White House COVID-19 Response Team and Public Health Officials (Dec. 29, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/12/29/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-76 (Statement of Dr. Anthony Fauci summarizing data from South Africa, United Kingdom, Scotland, and United States, indicating lower rates of death, severe illness, and length of hospital stay among COVID-19 patients infected by Omicron variant as compared to those infected by delta variant, and noting that "all indications point to a lesser severity of Omicron versus Delta"). This is particularly true among vaccinated individuals. *See* Press Briefing by White House COVID-19 Response Team and Public Health Officials (Dec. 29, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/12/29/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-76 (Statement of Dr. Rochelle Walensky reporting continued increased efficacy of vaccines in preventing severe illness or death from omicron variant). Accordingly, the CDC has concluded that even with increased community spread of the Omicron variant and the increased likelihood of "breakthrough infections," "[c]urrent vaccines are expected to protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant." CDC, Omicron Variant: What You Need to Know (Feb. 4, 2022), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html. Since hitting a peak

in late January 2022, COVID-19 cases, including cases stemming from the Omicron variant, have

been in sharp decline. *See* https://covid.cdc.gov/covid-data-tracker/#trends_dailycases.

## I.   ARGUMENT

### A.   Legal Principles for Compassionate Release Motions

This matter comes before the Court on defendant's motion for compassionate release

pursuant to 18 U.S.C. § 3582(c)(1)(A). Before the enactment of the First Step Act in 2018, only

the Bureau of Prisons could seek compassionate release for a defendant. *See United States v. Long*,

997 F.3d 342, 348 (D.C. Cir. 2021). With the passage of the First Step Act, however, defendants

now may file for compassionate release on their own behalf. *See id.* As amended by the First Step

Act, § 3582(c)(1)(A) now states in relevant part as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons,
> or upon motion of the defendant after the defendant has fully
> exhausted all administrative rights to appeal a failure of the
> Bureau of Prisons to bring a motion on the defendant's behalf
> or the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may
> reduce the term of imprisonment (and may impose a term of
> probation or supervised release with or without conditions that
> does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section
> 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)     extraordinary and compelling reasons warrant such a
> reduction; . . .
>
> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).[10]

---

[10] Under § 3582(c)(1)(A(ii), the Court may grant compassionate release to a defendant who has, among other things, served at least 30 years pursuant to a sentence imposed under 18 U.S.C. § 3559(c). The defendant is not serving a sentence under this provision and thus seeks early release under § 3582(c)(1)(A)(i).

In *United States v. Long*, 997 F.3d 342, 347 (D.C. Cir. 2021), the D.C. Circuit held that the policy statement set forth at U.S.S.G. § 1B1.13 "is not applicable to compassionate release motions filed by defendants." Accordingly, the Court is not bound by § 1B1.13 in deciding whether this defendant, who has filed for compassionate release, is entitled to early release under 18 U.S.C. § 3582(c)(1)(A). The government notes here that a number of the Circuits that have concluded that § 1B1.13 is not binding in connection with motions filed by defendants also have recognized that the policy statement continues to provide important "guideposts," *United States v. McGee*, 992 F.3d 1035, 1045 (10th Cir. 2021); *see United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to the United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused."); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (while the Fourth Circuit holds that "§ 1B1.13 is not applicable to *defendant-filed* motions under § 3582(c)," the court recognizes that "it defines, in the medical context, the same substantive term that applies to *BOP-filed* motions. One might reasonably believe therefore that the term 'extraordinary and compelling reasons' will be defined the same for defendant-filed motions." (emphasis in original)).

As the movant, the defendant bears the burden to establish that early release is warranted. *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). To do so, the defendant must show (a) that he has exhausted his right to appeal

the BOP's failure to seek compassionate release on his behalf or that 30 days have lapsed since he sought a reduction in sentence from the warden of his BOP facility; (b) the existence of extraordinary and compelling circumstances sufficient to warrant his early release; and (c) that weighing the applicable § 3553(a) factors counsel in favor of early release.

### B.  <u>The Defendant Has Not Shown that He is Entitled to Compassionate Release</u>

As it did with defendant's two prior motions, the Court should summarily deny the defendant's current motion for compassionate release. Although the defendant has exhausted administrative remedies, his medical conditions do not constitute an extraordinary and compelling reason based on increased risk of severe illness or death from COVID-19. Moreover, even assuming *arguendo* that the defendant's medical conditions would otherwise constitute an extraordinary and compelling reason for early release based on the risk of COVID-19, the defendant has been fully vaccinated and received a COVID-19 booster shot, and therefore cannot establish an extraordinary and compelling reason for release based on the risk of severe illness or death from COVID-19. Additionally, the § 3553(a) factors strongly weigh against release. Accordingly, as further explained below, the court should summarily deny the defendant's motion.

### 1.    *The Defendant Has Exhausted Administrative Remedies.*

As noted, 18 U.S.C. § 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it does so "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. . . ." § 3582(c)(1)(A). Here, the defendant submitted to the Warden an administrative request for compassionate release on October 21, 2021. *See* Ex. C, Reduction in Sentence Request.

15

In his administrative request, the defendant requested compassionate release based on his obesity, lung problems, vision issues, and the conditions of his confinement at FCI Beckley. *Id.* This is consistent with his motion to this Court. The Warden denied his request on November 16, 2021. *See* Ex. D, Reduction in Sentence Response. Because the defendant submitted a request to the warden and that request has been considered and denied, or because more than 30 days have passed since the warden received the defendant's request, the government concedes that the defendant has exhausted his administrative remedies. *See* 18 U.S.C. § 3582(c)(1)(A).

### 2. The Defendant Has Not Shown an Extraordinary and Compelling Reason for Compassionate Release

As explained above, a court can grant a sentence reduction, after considering the Section 3553(a) factors, only if it determines that "extraordinary and compelling reasons" justify the reduction. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant requests compassionate release based on the increased risk of severe illness or death from COVID-19 based on his medical conditions and his confinement at FCI Beckley. Dkt 102. He has not, however, demonstrated an "extraordinary and compelling reason" within the meaning of 18 U.S.C. § 3582(c)(1)(A)(i).

We note at the outset that the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, cannot alone provide a basis for a sentence reduction. As the D.C. Circuit recently found, "a pandemic affecting not only the entire prison population, but the entire world, does not constitute an extraordinary and compelling reason." *United States v. Jackson*, ---F.4th---, 2022 WL 598741, at *6 (D.C. Cir. Mar. 1, 2022). *See also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release"). Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of

lawfully imposed sentences to deal with a world-wide viral pandemic. That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate is elderly and/or has a chronic medical condition that has been identified as elevating the inmate's risk of severe illness or death from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons" even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.

According to guidance from the Centers for Disease Control and Prevention (CDC), adults of any age with certain conditions can be more likely to get severely ill from COVID-19. The conditions currently identified by the CDC include obesity. *See* CDC, *Medical Conditions* (Feb. 25, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Mar. 14, 2022).[11]

From the outset of the COVID-19 pandemic, the United States has followed CDC guidance when taking a position on whether a defendant has established extraordinary and compelling reasons for compassionate release based on increased risk of severe illness or death from COVID-19.  It has agreed that, during the pandemic, an inmate who has not been offered a vaccine, who presents one of the medical risk factors on the CDC list (as confirmed by medical records), and who is not expected to recover from that condition presents an extraordinary and compelling reason for compassionate release, even if his condition would not necessarily suffice to establish an extraordinary and compelling reason outside the context of the COVID-19 pandemic.

---

[11] The CDC's guidance notes that its list of risk factors does not include all medical conditions that could make a person more likely to get severely ill; thus, rare medical conditions are not included.

The defendant's health conditions do not establish an extraordinary and compelling reason for release. The government recognizes that obesity is among the CDC's list of underlying medical conditions associated with a higher risk for severe COVID-19. *See* CDC, *Medical Conditions* (Feb. 25, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Mar. 14, 2022). BOP's medical records show that the defendant' BMI was 32.2 as of October 5, 2021. *See* Ex. A, BOP Medical Records, at 10. The government's previous position was that obesity would increase a defendant's risk of death or serious illness from COVID-19 such that he could establish an extraordinary and compelling reason for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), provided he had not been offered a vaccine. However, the D.C. Circuit recently found that obesity is not a COVID-19 risk factor constituting an extraordinary and compelling reason justifying release. *See Jackson*, 2022 WL 598741, at *6 (D.C. Cir. Mar. 1., 2022). Moreover, as discussed *infra*, the defendant cannot establish an extraordinary and compelling reason based on increased risk of severe illness or death from COVID-19 because he is fully vaccinated and recently received a booster shot.

The defendant's prior lung injury and vision problems also do not provide a basis for relief. As the Court previously explained, neither of these health issues is recognized by the CDC as an underlying condition that increases one's risk of becoming severely ill from COVID-19. *Edwards*, 2021 WL 3128870, at *3. The Court rejected the defendant's claim that he was entitled to compassionate release because of his previous lung injury when denying his first and second motions for compassionate release. *Id.* ("For one, Edwards' lung injury did not justify release even earlier in the pandemic, so the same condition cannot justify release now."). The defendant has not presented any new arguments or evidence regarding his lung injury in the instant motion and therefore is not entitled to relief now.

18

Likewise, the defendant once again argues that he should be released because of his keratoconus condition, which has resulted in a loss of his vision. *See* Defendant's Motion, Dkt. 102, at 5-6. In denying his second motion for compassionate release, the Court found that the defendant had already undergone a successful cross-linking procedure for this condition, and it was unclear whether his request for a cornea replacement was necessary or would be available to him outside of prison. *Edwards*, 2021 WL 3128870, at *4.[12]

In sum, the defendant has not established an extraordinary and compelling reason based on his obesity, prior lung condition, or ongoing vision problems. Moreover, in this case, because the defendant is fully vaccinated, he cannot establish an extraordinary and compelling reason for early release despite his medical conditions.

The defendant received the first dose of the Moderna COVID-19 vaccine on January 14, 2021, and the second dose on February 8, 2021. Ex. A, BOP 2022 Medical Records, at 50; Ex. 4 to Gov't's Opp'n to Def.'s Mot. for Compassionate Release, Dkt. 93. He also recently received a third Moderna COVID-19 dose on January 26, 2022. Ex. A, BOP 2022 Medical Records, at 82. The defendant's risk of serious complications from COVID-19 is substantially diminished because of his vaccination and very recent booster dose. The CDC has repeatedly assured the public that

---

[12] The defendant now also asserts that he cannot see because he has not received the hard contact lenses he was prescribed at his previous BOP facility. Defendant's Motion, Dkt. 102, at 5-6. However, vision loss is not a condition the CDC has identified as placing individuals at greater risk of severe illness or death from COVID0-19. *See* CDC, *Medical Conditions* (Feb. 25, 2022), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Mar. 14, 2022). In any event, while the defendant's medical records confirm that he was supposed to be fit for specialty contact lenses at his previous prison facility, he did not receive them because he did not complete the mandatory contact lenses training. *See* Ex. A, BOP Medical Records, at 8. On January 4, 2022, his physician at FCI Beckley requested an evaluation and fitting for the specialty contact lenses. *Id.* at 6. Thus, the issue is being resolved, and the defendant has not demonstrated that he is receiving inadequate care for his vision issues.

"COVID-19 vaccines are effective and can lower your risk of getting and spreading the virus that causes COVID-19. COVID-19 vaccines also help prevent serious illness and death in children and adults even if they do get COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (last visited Mar. 14, 2022). Even if the defendant is at elevated risk due to his medical conditions, he is not likely to suffer exacerbation of these conditions as a result of COVID-19, because the vaccine will strengthen defendant's immune response to the virus, protecting him from getting sick or suffering severe health complications.

As noted *supra* in Section 1.C., the available COVID-19 vaccines reduce the risk of infection, and, more importantly, greatly reduce the risk of suffering severe health complications from the virus.  Thus, as the Seventh Circuit has explained:

> [F]or the many prisoners who seek release based on the special risks created by COVID-19 for people living in close quarters, vaccines offer relief far more effective than a judicial order. A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) (Easterbrook, J.). The Third and Sixth Circuits have agreed with this assessment. *See United States v. Church*, Nos. 21-1840 & 21-2299, 2021 WL 5632062, at *2 (3d Cir. Dec. 1, 2021) (recognizing that "otherwise compelling medical reasons for release" cannot justify compassionate release when COVID-19 vaccines are available); *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) ("a defendant's incarceration during the COVID-19 pandemic—when the defendant has access to the COVID-19 vaccine—does not present an 'extraordinary and compelling reason' warranting a sentence reduction"). This Court previously denied relief to the defendant because he was fully vaccinated, noting that "several courts in this District have recognized that vaccines reduce the risk that inmates with underlying conditions face from COVID-19." *Edwards*, 2021 WL 3128870, *3. Numerous other judges in

this district likewise "have now recognized that 'the remarkable effectiveness of these vaccines raises an extremely high bar to establishing extraordinary and compelling reasons for a sentence reduction based on the risk of contracting COVID-19.'" *United States v. Sumler*, 2021 WL 6134594, at *26 (D.D.C. Dec. 28, 2021) (BAH) (quoting *United States v. Clark*, No. 10-0133 (PLF), 2021 WL 5630795, at *4 (D.D.C. Dec. 1, 2021) (collecting cases)); *see also United States v. Morales*, 2021 WL 4622461, at *6 (D.D.C. Oct. 7, 2021) (JDB) (denying relief for a defendant who received the Johnson & Johnson vaccine because it provided "substantial protection against COVID—and especially against life-threatening courses of the disease").

Moreover, courts across the country have generally found the presence of the COVID-19 Omicron variant to be inadequate to overcome the presumption against finding an extraordinary and compelling reason for relief when the defendant has been vaccinated. *See, e.g., United States v. Batista*, 2022 WL 443647, at *1 (S.D.N.Y. Feb. 14, 2022) (finding that the Omicron variant did not constitute an extraordinary or compelling circumstance where the defendant was "fully vaccinated and, as a result, he is unlikely to develop serious illness if infected with the Omicron variant"); *United States v. Jaber*, 2022 WL 35434, at *3 (S.D.N.Y. Jan. 4, 2022) (noting that although "the Omicron variant appears to be more resistant to the vaccines…recent studies have revealed that…vaccination still provides excellent protection against the most severe consequences [such as] death and extended hospitalization"); *United States v. Allison*, 2022 WL 345593, at *2 (S.D. Ill. Feb. 4, 2022) (noting that COVID-19 vaccines protect against severe illness and death due to infection with the Omicron variant, making it "impossible to conclude that the risk of COVID-19 is an extraordinary and compelling reason for immediate release") (internal quotations and citation omitted); *United States v. Butler*, 2022 WL 317753, at *4 (E.D. Mich. Feb. 2, 2022) ("[G]iven that COVID-19 vaccines mitigate the potential harm of the Delta and Omicron

21

variants, it is not an 'extraordinary and compelling reason' to grant compassionate release."); *United States v. Ngo*, 2022 WL 207704, at \*3 n.1 (S.D. Cal. Jan. 24, 2022) ("The CDC's recent pronouncements regarding the vaccine's effectiveness in protecting against severe illness and death apply equally to the Omicron variant, even though the Omicron variant appears to be more transmissible than earlier COVID-19 strains.");  *United States v. Lipsey*, 2022 WL 180725, at \*2 (D. Ariz. Jan. 20, 2022) (finding that defendant's health conditions did not amount to extraordinary and compelling reasons to warrant a reduction in his sentence because COVID-19 vaccines are effective at preventing serious illness, even against the Omicron variant).

Finally, the government notes that, in addition to the fact that the defendant himself is vaccinated, many of the other inmates at his facility are also vaccinated, which further reduces his risk of contracting the virus. As of this writing, BOP has fully vaccinated (both doses) 252 staff members and 1,166 inmates at FCI Beckley. *See* COVID-19 Vaccine Implementation, available at: https://www.bop.gov/coronavirus/ (last visited Mar. 14, 2022). There are currently 1,551 inmates at FCI Beckley.  *See*  https://www.bop.gov/locations/institutions/bec/ (last visited Mar. 14, 2022). Therefore, 75.1 percent of the inmates at the defendant's institution are now fully vaccinated. The vaccination rate is high; indeed, it is higher than the vaccination rate in most of the country outside of the BOP. *See, e.g.,* https://www.nytimes.com/interactive/2021/world/covid-vaccinations-tracker.html (noting that 65% of the country is fully vaccinated) (last visited Mar. 14, 2022).

In sum, on the current record, the defendant's medical conditions cannot be properly characterized as extraordinary and compelling. To the contrary, he has received the most beneficial treatment currently available to prevent COVID-19 infection, inside or outside of the BOP. The defendant's medical conditions are under control and being properly treated in the prison

22

environment. The defendant has not established an extraordinary and compelling reason for release

based on the risk of severe illness or death from COVID-19 due to his medical conditions.[13]

### 3.    The § 3553(a) Factors Weigh Against Release.

This Court must also consider the 18 U.S.C. § 3553(a) factors, as "applicable," as part of

its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th

Cir. 2020). The factors that the Court must consider under § 3553(a) (which sets forth factors the

Court must consider at sentencing) include "the nature and circumstances of the offense," "the

history and characteristics of the defendant," and also the need for a sentence "to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further

---

[13]   The defendant also argues that the conditions of his confinement at FCI Beckley during the COVID-19 pandemic pose significant risks to his health. *See* Defendant's Motion, Dkt. 102, at 2, 5-7. This claim is not properly before the Court. The proper way to raise a claim concerning the constitutionality of BOP's actions or the conditions of the defendant's confinement is to file a civil suit against the defendant's current jailer in the district of confinement. *See, e.g.*, *United States v. Folse*, 2016 WL 3996386, at *15 (D.N.M. June 15, 2016) ("The general rule is that a defendant must file a separate civil action to address his conditions of confinement."); *United States v. Luong*, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009) ("As several courts have recognized, the proper procedure to redress a defendant's grievances regarding treatment within a jail or prison is to file a civil suit against the relevant parties…rather than a motion in his criminal case."); *United States v. Wells*, 2007 WWL 3025082, at *2 (W.D. Ky. Oct. 15, 2007) ("[T]o the extent Wells is challenging his condition of confinement by claiming that his life is in danger, the appropriate course would be to file a civil action against the alleged wrongdoers, not a Rule 60(b) motion in his criminal action.").

Where a claim challenging condition of confinement is erroneously filed in a defendant's criminal case, the district court should deny the claim. *See, e.g.*, *United States v. Banks*, 422 F. App'x 137, 138 n.1 (3d Cir. 2011) (per curiam) ("We agree with the District Court that a motion filed in his criminal case was not the proper vehicle for raising the claims about prison conditions in that motion."); *United States v. Garcia*, 470 F.3d 1001, 1003 (10th Cir. 2006) (noting that, because the defendants' "challenge[s] to the conditions of confinement…were raised in motions filed in their respective criminal cases…they were properly denied by the district court"). Indeed, this Court previously denied the defendant's claim that his continued confinement violated the Eighth Amendment because "a compassionate release motion…is not the appropriate mechanism or vehicle to raise such a claim of alleged constitutional violations." *Edwards*, 2021 WL 3128870, at *6 (citation omitted). Accordingly, the Court should summarily deny the defendant's claims regarding the conditions of his confinement in his instant motion.

crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, and other correctional treatment in the most effective manner."

Even where a defendant has established an extraordinary and compelling reason for release, the Court may reduce his sentence only if the balance of the § 3553(a) factors favor release. *See United States v. Edwards*, 2020 WL 5518322 at *4 (D.D.C. Sept. 12, 2020) ("[E]ven if Mr. Edwards <u>had</u> presented "extraordinary and compelling reasons" for release, the Court may reduce his term of imprisonment only if the balance of the § 3553(a) factors favor his release." (emphasis in original)); *see also United States v. Holroyd*, 464 F. Supp. 3d 14, 19 (D.D.C. 2020) ("If a defendant still poses a danger to the community or if the balance of factors under § 3553(a) favor continued imprisonment, these are independent reasons to deny a motion for compassionate release."); *United States v. Sears*, 2020 WL 3250717 at *2 (D.D.C. June 16, 2020) (denying compassionate release to inmate with diabetes, hypertension and asthma who had established extraordinary and compelling reasons because "this Court does not, and cannot, find that a reduction in [Defendant]'s term of imprisonment is consistent with the § 3553(a) factors at this time"). As this Court previously has found, consideration of these factors weighs against releasing the defendant early. And the defendant has not pointed to any new information warranting a grant of compassionate release.

a.   The Nature and Circumstances of the Offense

The nature and circumstances of the defendant's crimes weigh against any sentence reduction. In this case, the defendant was in possession of two loaded handguns and a quantity of PCP consistent with an intent to distribute. When sentencing the defendant, this Court observed that "possession of phencyclidine with intent to distribute is a serious offense. It is obviously something that is of concern to the community and to the Court in the criminal justice system."

*Edwards*, 427 F.Supp.2d 178, at 27 (D.D.C. 2006), citing Tr. at 27-29. As noted *supra*, after completing his sentence in this case, the Court resentenced the defendant again when he violated his supervised release by his participation in an armed burglary and robbery. The defendant argues that he should be released because he only has "non[-]violent violation time [ ] left to serve." Defendant's Motion, Dkt. 102, at 13. However, in denying his second motion for compassionate release, the Court observed that "[a]lthough a supervised release violation is a non-violent offense, the conduct that caused the violation—armed robbery and burglary—is serious and warrants substantial prison time." *Edwards*, 2021 WL 3128870, at *4. Thus, as the Court has previously concluded, the nature and circumstances of the offense weigh against a sentence reduction.

## b. History and Characteristics of the Defendant

The defendant's criminal history further militates against early release. In denying the defendant's prior compassionate release motions, the Court considered the defendant's "lengthy history of connection with the criminal justice system, including escape from a halfway house and a prior conviction for possession of a handgun." *Id.* (quoting *Edwards*, 2020 WL 5518322, at *4). While on supervised release in this case, the defendant was arrested for and pleaded guilty to charges of armed burglary and armed robbery in D.C. Superior Court. *Edwards*, 2020 WL 5518322, at *4. Moreover, while in prison, he "committed several serious disciplinary infractions, including possessing a dangerous weapon in 2018, possessing a hazardous tool in 2013, and assaulting a staff member in 2013." *Id.* (citation omitted). In December 2020, less than two years ago, the defendant committed another infraction, possessing a dangerous weapon in prison. *Edwards*, 2021 WL 3128870, at *4; *see also* Ex. E, BOP Disciplinary Records (noting that the defendant admitted to possession of a sharpened metal instrument). In denying his compassionate release motion less than eight months ago, the Court found that this recent and dangerous

disciplinary infraction also weighed against the defendant's release. *Edwards*, 2021 WL 3128870, at *4.

The defendant argues that he has completed "multiple programs that would negate his high risk of recidivism." Defendant's Motion, Dkt. 102, at 2. He now highlights his educational courses in prison, including classes in computer software, 2500 hours of an apprenticeship, and a vocational training course where he earned his Forklift Operator Certificate. *Id.* at 2-3.  While his BOP educational transcript denotes that he has taken computer courses and completed 2500 hours as a "recreation assistant," there is no indication that he has earned a Forklift Operator Certificate, nor has he attached a certificate to his motion. *See* Ex. F, BOP Education Transcript, at 1. In any event, as this Court found in denying his prior motions compassionate release, the defendant's educational courses "[do] not outweigh the extent of his criminal history and disciplinary record." *Edwards*, 2021 WL 3128870, at *4; *see also Edwards*, 2020 WL 5518322, at *4 ("Although [the defendant] has completed some educational courses and demonstrated a willingness for self-improvement, the extent of his criminal history and prison disciplinary record weigh against a reduced sentence.") (internal citation omitted). The defendant's significant criminal history and disciplinary infractions still weigh strongly against release or any reduction in his sentence.

### c.   Need for the Sentence Imposed

The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a). When denying the defendant's first two compassionate release motions, the Court determined that his "'26-month federal sentence is proper' in light of the underlying offense." *Edwards*, 2021 WL 3128870, at *5 (quoting *Edwards*, 2020 WL 5518322, at *4). The Court explained that this sentence "appropriately reflects the seriousness of Edwards's offense and

furthers the goals of providing just punishment and affording adequate deterrence." *Id.* The Court further determined that the defendant "would continue to benefit from further correctional treatment," particularly "given his continued history of disciplinary infractions." *Id.* This reasoning remains true today, as the defendant has not presented any new evidence warranting a reduction in his sentence.

### d.  Victim Impact

Other than general community harm associated with gun possession and drug trafficking, we could not identify any discernable victims who incurred a financial loss or suffered physical harm as a result of the defendant's conduct. *See* Presentence Investigation Report, at 4. Thus, the government has not made efforts to contact any victims to ascertain their position on the defendant's motion.

### e.  Defendant's Release Plan

Finally, the government notes that the defendant has not provided a concrete and detailed release plan. Without a firm and realistic plan in place, it is more likely that the defendant will be unable to successfully re-integrate into civil society and that he will place the community at risk. *See United States v. Allison*, 2020 WL 3077150, *4 (W.D. Wash. June 10, 2020) ("An appropriate release plan is essential to ensure that a defendant actually has a safe place to live and access to health care in these difficult times. Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the defendant is release[d]").

As in his prior motion, the defendant states that he will live with his stepmother and that his brother can drive him from FCI Beckley to his stepmother's house in Fort Washington,

Maryland upon release.[14] Defendant's Motion, Dkt. 102, at 4, 7-8; Dkt. 94, at 8-9. He gives no indication, however, that his stepmother has agreed to make her home available to him.[15] He further asserts that he has a "job promise" from a manager of a Chick-fil-A restaurant in Prince George's County, Maryland. *Id.* at 4. While he provides a name and contact information for the manager, he does not offer any evidence that he has been offered a job. In sum, this Court should not release the defendant without an appropriate release plan in place, and the vague reference the defendant makes regarding the availability of his family's resources to help him upon release and a "job promise" is insufficient to mitigate the serious risk of his reoffending. *See United States v. Allison*, 2020 WL 3077150, *4 (W.D. Wash. June 10, 2020) ("Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the defendant is release[d]").

---

[14]   The defendant proposes that he will live in Maryland, but he is required to live in Washington, D.C. upon release or until his supervision his transferred. See 18 U.S.C. § 4104.

[15]   The defendant also requests compassionate release so that he can care for his son and his aging stepmother, as he did in his second motion for compassionate release. *Id.* The Court previously recognized the defendant's desire to "be a positive role model for his son" and care for his stepmother, who has suffered from various health issues, but found that these were not extraordinary and compelling reasons for release. *Edwards*, 2021 WL 3128870, at *1.

## **CONCLUSION**

For the reasons above, and based on the entire record, the defendant has not met his burden to show that he is entitled to early compassionate release. The Court should summarily deny his motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C.  Bar No. 481052

MARGARET J. CHRISS
Assistant United States Attorney
Chief, Special Proceedings Division
D.C. Bar No. 452403

PETER S. SMITH
Assistant United States Attorney
Deputy Chief, Special Proceedings Division
D.C. Bar No. 465131

*/s/ Simran Dhillon*
SIMRAN DHILLON
Assistant United States Attorney
Special Proceedings Division
PA Bar No. 312390
Washington, D.C.  20530
202-252-2570
simran.dhillon@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 18th day of March, I caused a copy of the foregoing to be served via the Electronic Case Filing system by mail upon defendant James Edwards, Reg. No. 31043-007, FCI Beckley, P.O. Box 350, Beaver, WV 25813.

*/s/ Simran Dhillon*
SIMRAN DHILLON
